UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT LYNN JACKSON, JR., et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF MOUNTLAKE TERRACE, et al., <br><br> Defendants. | CASE NO. C16-1282JLR <br><br> ORDER GRANTING DEFENDANTS SWEDISH MEDICAL CENTER AND GRETCHEN TOPPING'S MOTION TO DISMISS |

## I.   INTRODUCTION

Before the court is Defendants Swedish Medical Center ("Swedish") and Gretchen Topping's (collectively, "Medical Center Defendants") Federal Rule of Civil Procedure 12(b)(6) motion to dismiss Plaintiffs' claims against them. (MTD (Dkt. # 9); *see also* Reply (Dkt. # 16).)  Plaintiffs oppose Medical Center Defendants' motion. (Resp. (Dkt. # 15).)  The court has reviewed the motion, all of the parties' submissions related to the

motion, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court GRANTS the motion and dismisses Plaintiffs' claims against Medical Center Defendants. Further, the court declines to grant Plaintiffs leave to amend their claims against Medical Center Defendants because their claims against these defendants fail as a matter of law.

## II. BACKGROUND

The allegations underlying this lawsuit are tragic. Plaintiffs Robert Lynn Jackson, Jr. and Catherine Irene Jackson are the parents of the decedent, Forest Edwin Jackson, who was murdered on March 28, 2014. (Compl. (Dkt. # 1) ¶¶ 1-3.)

Plaintiffs allege that "law enforcement" knew that Toby Sauceda was a danger to himself and others based on a July 19, 2014, newspaper article that described a February 2014, incident. (*Id.* ¶ 9.) According to the article, Mr. Sauceda "barricaded himself inside an apartment after threatening to slit his [own] throat and overdose on pills." (*Id.*) The article also states that Mr. Sauceda pointed "a BB-gun made to appear like a Beretta semiautomatic pistol" at an officer. (*Id.*) As a result of this incident, police charged Mr. Sauceda with assault. (*Id.*)

Plaintiffs allege that on March 28, 2014, Mr. Sauceda called 911 "and reported that he had raped a woman." (*Id.* ¶ 10.) Plaintiffs further allege that police officers

//
//

---

[1] No party requests oral argument, and the court has determined that oral argument is unnecessary to the disposition of this motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

responded to the scene and "confirmed that [Mr. Sauceda] had in fact raped a woman."[2] (*Id.*) Plaintiffs allege that instead of arresting Mr. Sauceda for rape, one of the officers filled out an involuntary commitment form (*id.* ¶ 13(a)) and the officers then "dropped [Mr.] Sauceda off at [Swedish] and drove away" (*id.* ¶ 13(b)).[3]

Plaintiffs allege that Medical Center Defendants failed to involuntarily commit Mr. Sauceda for mental health treatment, and that Medical Center Defendants' release of Mr. Sauceda from the hospital created an immediate danger for Forest Jackson. (*Id.* ¶¶ 7, 13(b), 14.) Plaintiffs allege that Mr. Sauceda killed Forest Jackson on March 28, 2014, "within a span of little over an hour" after Mr. Sauceda's release from Swedish. (*Id.* ¶ 7.)

Pursuant to 42 U.S.C. § 1983, Plaintiffs claim that Medical Center Defendants violated Plaintiffs' constitutional rights by releasing Mr. Sauceda "with deliberate indifference to the rights of others" after Medical Center Defendants determined that Mr. Sauceda "did not meet any of the criteria for an involuntary hold." (*Id.* ¶¶ 7, 13(b)-14.) Plaintiffs also assert a negligence claim, alleging that Medical Center Defendants "violated their own internal policies, practices, and mandates with regard to the creation" of danger and "caused harm to Plaintiffs in such a way that was avoidable and preventable." (*Id.* ¶ 16.)

//

---

[2] The alleged rape victim was residing in the same apartment as the decedent, Forest Jackson. (Compl. ¶ 11.)

[3] There are two paragraphs numbered as "13" in the complaint. (Compl. at 4-5.) For clarity, the court has designated the first such paragraph as "13(a)" and the second such paragraph as "13(b)."

Medical Center Defendants move to dismiss these claims. (*See* Mot.; *see also* Reply.) Plaintiffs oppose Medical Center Defendants' motion. (Resp.) The court now considers Medical Center Defendants' motion.

### III. ANALYSIS

#### A. Standard for a Motion to Dismiss

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court construes the complaint in the light most favorable to the nonmoving party. *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). The court must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). A court may dismiss a complaint as a matter of law if it lacks a cognizable legal theory or states insufficient facts under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

The court need not accept as true a legal conclusion presented as a factual allegation. *Iqbal*, 556 U.S. at 678. Although the pleading standard of Federal Rule of Civil Procedure 8 does not require "detailed factual allegations," it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*,

550 U.S. at 555). A pleading that offers only "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.*

**B. Plaintiffs' § 1983 Claim**

"To state a claim under 42 U.S.C. § 1983, a plaintiff [1] must allege a violation of a right secured by the Constitution and the laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). If a plaintiff fails to allege sufficient facts to support both elements of a § 1983 claim, dismissal under Rule 12(b)(6) is appropriate. *See Jones v. Cmty. Redevelopment Agency of City of L.A.*, 733 F.2d 646, 649 (9th Cir. 1984).

Section 1983 ordinarily "supports a claim only when the alleged injury is caused by 'state action' and not by a merely private actor, against whom state tort remedies may be sought in state court." *Jensen v. Lane Cty.*, 222 F.3d 570, 574 (9th Cir. 2000). Without state action, a plaintiff cannot state a 42 U.S.C. § 1983 claim for relief against a private party. *Rendell-Baker v. Kohn*, 457 U.S. 830, 843 (1982). The Ninth Circuit recognizes four tests for determining whether a private individual can be considered a state actor for purposes of 42 U.S.C. § 1983: (1) public function, (2) joint action, (3) governmental compulsion or coercion, and (4) governmental nexus. *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003). Although Plaintiffs reference these tests in their complaint (Compl. ¶ 14), they do not allege facts raising a plausible inference of state

action by Medical Center Defendants (*see generally id.*), and the court does not accept Plaintiffs' conclusory allegations of state action as true. *See Iqbal*, 556 U.S. at 678.

### 1. The Hybrid "Close Nexus /Joint Action" Test

The court finds the Ninth Circuit's analysis of state action in *Jensen*, which involved an involuntary commitment following an arrest, to be instructive although not controlling. In evaluating whether a private, contract psychiatrist involved in a plaintiff's involuntary commitment was a state actor subject to suit under 42 U.S.C. § 1983, the Ninth Circuit has applied a hybrid "close nexus /joint action" test. *Jensen*, 222 F.3d at 574.

In *Jensen*, the plaintiff had been arrested for pointing a gun out of his car window at a police officer. *Id.* at 572. The plaintiff told the officers that he routinely took prescription medication to treat various conditions, including depression. *Id.* While the plaintiff was incarcerated, the plaintiff's boss called the jail to report that the plaintiff had been acting strangely prior to his arrest and had talked about workplace shootings. *Id.* This call led a mental health specialist employed by the county to review the plaintiff's arrest records and interview the plaintiff. *Id.* After consulting with a private psychiatrist, who was a contract employee of the county, and a county-employed psychiatrist, the county's mental health specialist recommended that the plaintiff be held at a psychiatric hospital for further evaluation. *Id.* at 573. The contract psychiatrist signed the detention order after reviewing the plaintiff's arrest records, but without examining the plaintiff. *Id.* The plaintiff was held at a publicly-owned hospital staffed by private medical personnel under contract. *Id.* By the end of the statutory temporary commitment period,

the plaintiff had been examined by both the contract psychiatrist and the county-employed psychiatrist, the latter of whom recommended the plaintiff's release. *Id.* The plaintiff was signed out by the contract psychiatrist and immediately brought suit under 42 U.S.C. § 1983. *Jensen*, 222 F.3d at 573.

The private, contract psychiatrist moved for summary judgment on the plaintiff's § 1983 claim arguing that his alleged conduct did not meet the element of state action. *See Jensen*, 222 F.3d at 572. In describing its application of the hybrid "close nexus/joint action" test, Ninth Circuit stated that, to be considered state action, the court "must find a sufficiently close nexus between the state and private actor 'so that the action of the latter may be fairly treated as that of the State itself.'" *Id.* at 574 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974)). The Court also stated that "the State [must be] so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Id.* (quoting *Jackson*, 419 U.S. at 357-58).

In determining that the contract psychiatrist would be subject to a claim under 42 U.S.C. § 1983 as a state actor, the Ninth Circuit emphasized that the arrangement between the county and its private contractors was a "complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others." *Id.* at 575. The Ninth Circuit also noted the "significant consultation with and among the various [public and private] mental health professionals." *Id.* Accordingly, the Court concluded that "there [wa]s 'a sufficiently close nexus between the State and the challenged action of the [contract psychiatrist] so that the actions of the latter [could] be fairly treated as that of the State itself." *Id.*

1       The Ninth Circuit also rejected the notion that the Supreme Court's decision in

2 *Blum v. Yartesky*, 457 U.S. 991, 1004 (1982), controlled the outcome in *Jensen*. In *Blum*,

3 the Supreme Court found no state action where nursing homes, which the State had

4 licensed, heavily regulated, and funded, had downgraded patient care. *Id.* The Supreme

5 Court found that there was no state action when the determinations of private parties

6 "ultimately turned on [the] medical judgments" of those parties "according to

7 professional standards that are not established by the State." *Id.* In holding that *Blum* did

8 not apply to *Jensen*, the Ninth Circuit stated that "[t]he real issue is whether the state's

9 involvement in the decision-making process rises to the level that overrides the 'purely

10 medical judgment' rationale of *Blum*." *Jensen*, 222 F.3d at 575.

11       In sharp contrast to the intertwined actions of and significant consultation among

12 the State and private actors in *Jensen*, Plaintiffs here have alleged minimal, if any,

13 interaction between the governmental actors and Medical Center Defendants. Plaintiffs

14 allege that one of the defendant officers "filled out an involuntary commitment form,"

15 and both defendant officers then "dropped [Mr.] Sauceda off at the hospital and drove

16 away." (Compl. ¶¶ 13(a)-(b).) In addition, Plaintiffs allege that Ms. Topping, who is a

17 mental health professional employed by Swedish (*id.* ¶ 7), then asked Mr. Sauceda a

18 series of questions, regarding date, time, and current events (*id.* ¶ 13(b)). She also noted

19 that Mr. Sauceda stated that he had no desire to harm himself or others. (*Id.*)

20 Accordingly, Ms. Topping concluded that Mr. Sauceda "did not meet any of the criteria

21 for an involuntary hold" (*see id.*), and she released him "without contacting law

22 enforcement" (*id.* ¶ 7). These alleged facts do not demonstrate the "close nexus" or

"interdependence" between private medical personnel and governmental actors that justified a finding of state action in *Jensen* sufficient to support a § 1983 claim. *See Jensen*, 222 F.3d at 574. Indeed, the governmental actors' alleged involvement in the decision-making process here does not "rise[] to the level that overrides the 'purely medical judgment' rationale of *Blum*." *Jensen*, 222 F.3d at 757. Accordingly, the court concludes that Medical Center Defendants are not state actors for purposes of a claim under 42 U.S.C. § 1983.

### 2. The Public Function and Government Compulsion Tests

The Ninth Circuit utilized a hybrid "close nexus/joint action" test to analyze state action issues concerning a § 1983 claim against a private doctor that arose out of the involuntary commitment of the plaintiff. *See Jensen*, 222 F.3d at 574. As discussed above, the court concludes that this same test is the appropriate one to apply in this case. *See supra* § III.B.1. However, even if the court were to apply the public function or the governmental compulsion test to Plaintiffs' allegations, these alternative tests also provide no basis for finding state action with respect to Plaintiffs' § 1983 claim against Medical Center Defendants.

Under the public function test, when the State endows a private individual or a group with powers or functions that are governmental in nature, the individual or group becomes an agency or instrumentality of the State subject to the State's constitutional limitations. *Lee v. Katz*, 276 F.3d 550, 554-55 (9th Cir. 2002). The "relevant question is not simply whether a private group is serving a 'public function,' but rather it "is whether the function performed has been 'traditionally the exclusive prerogative of the State.'"

*Rendell-Baker*, 457 U.S. at 842 (citations omitted, italics in original) (concluding that the state's mere legislative choice to provide services for maladjusted high school students at public expense "in no way makes these services the exclusive province of the State."). Washington's Involuntary Treatment Act demonstrates that Washington does not reserve the initial medical and mental health examination and release of persons who do not meet the criteria for detention as an exclusively public function. *See* RCW 71.05.050(3) (authorizing "the professional staff" of either a public or private hospital emergency room to detain individuals under certain circumstances); RCW 71.05.153(2)(b) (authorizing a police officer to detain and deliver a person to an emergency department of a hospital under certain circumstances). Because the professional staff of both public and private hospitals may perform the functions that Medical Center Defendants performed in this case, Plaintiffs cannot demonstrate the exclusivity required by the public function test to transform Medical Center Defendants' private action into state action for purposes of Plaintiffs' § 1983 claim. *See Jensen*, 222 F.3d at 574 (noting that courts analyzing the action of private physicians performing psychiatric evaluations and recommending involuntary treatment, on a state-by-state basis, "have held that mental health commitments do not constitute a function 'exclusively reserved to the State.'").

Likewise, the governmental compulsion test does not suffice to transform Medical Center Defendants' alleged actions into state actions either. This test asks "whether the coercive influence or 'significant encouragement' of the state effectively converts a private action into a government action." *Kirtley*, 326 F.3d at 1094. Here, Plaintiffs allege that one of the police officers filled out an involuntary commitment form, and the

two officers dropped Mr. Sauceda off at Swedish and drove away. (Compl. ¶¶ 13(a)-(b).) Medical Center Defendants then determined that Mr. Sauceda did not meet the criteria for involuntary commitment and released him without contacting the police officers. (*Id.* ¶¶ 7, 13(b).) These alleged facts are insufficient to establish any "coercive influence" on the part of the officers. The court thus concludes that Plaintiffs fail to establish the existence of any state action on the part of Medical Center Defendants under the governmental compulsion test.[4]

Because Plaintiffs fail to adequately allege that Medical Center Defendants are state actors or that their alleged actions constitute state action, the court grants Medical Center Defendants' motion to dismiss Plaintiffs' 42 U.S.C. § 1983 claims.

### C. Plaintiffs' Negligence Claim

Plaintiffs also assert a claim for negligence against Medical Center Defendants. (Compl. ¶ 16.) The court concludes that there are two reasons that it must dismiss this claim—one statutory and the second based on common law notions of duty. The court discusses each basis for dismissal in turn.

### 1. Statutory Immunity

Washington's Involuntary Treatment Act, RCW ch. 71.05, provides "the only authority under which" Medical Center Defendants could have detained Mr. Sauceda. *Poletti v. Overlake Hosp. Med. Ctr.*, 303 P.3d 1079, 1082 (Wash. Ct. App. 2013); *Estate*

---

[4] Because the court concludes that Plaintiffs' § 1983 claim against Medical Center Defendants fails due to a lack of alleged state action, the court need not consider Medical Center Defendants' argument that Plaintiffs failed to allege that Medical Center Defendants violated one of Plaintiffs' constitutional rights. (*See* Mot. at 11-17.)

of *Davis v. State, Dep't of Corr.*, 113 P.3d 487, 491 (Wash. 2005), as amended (June 2, 2005) ("To the extent the estate alleged Mr. Jones was liable because he failed to detain Mr. Erikson, the immunity provision of RCW 71.05.120 applies because the only authority for him to detain Mr. Erikson was under chapter 71.05 RCW."). RCW 71.05.120(1) provides:

> No officer of a . . . private agency, nor . . . his or her professional designee, or attending staff of any such agency . . . shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment: PROVIDED, That such duties were performed in good faith and without gross negligence.

*Id.* Thus, pursuant to this statute, "a mental health professional is immune from tort liability in the performance of his duties unless he acted in bad faith or with gross negligence." *Estate of Davis*, 113 P.3d at 491. Gross negligence is "substantially and appreciably greater than ordinary negligence." *Id.* Bad faith requires a conscious doing of wrong, through ill or fraudulent motives. *Spencer v. King County*, 692 P.2d 874, (Wash. Ct. App. 1984), *overruled on other grounds by Frost v. Walla Walla*, 724 P.2d 1017 (Wash. 1986).

Although Plaintiffs allege that Medical Center Defendants were negligent, Plaintiffs do not allege that Medical Center Defendants acted either in bad faith or with gross negligence as required to overcome the immunity statute. (*See generally* Compl.) Further, Plaintiffs allege no facts to support a reasonable inference of either gross

negligence or bad faith.[5] (*See generally id.*)  Indeed, Plaintiffs do not allege that Ms. Topping released Mr. Sauceda after failing to assess him, or after observing him suffering from mental health problems, or after he told her that he was a danger to himself or others.  (*See generally id.*)  Indeed, Plaintiffs' allegations are to the opposite effect.  Plaintiffs allege that Ms. Topping released Mr. Sauceda only after conducting an assessment during which Mr. Sauceda participated and "answered all of the standard questions," "appeared to be lucid," stated he had no desire to harm himself or others, and claimed he was feigning the symptoms reported by the police officers.  (*Id.* ¶ 13(b).)  Even assuming that the court could infer from Plaintiffs' allegations that Ms. Topping's assessment was incomplete or unreasonable, such allegations are insufficient to state a claim against Medical Center Defendants because they do not rise to the level of gross negligence or bad faith.  *See Estate of Davis*, 113 P.3d at 491-92 (holding that even an assessment under Washington's Involuntary Treatment Act that "was incomplete and unreasonable" would not rise to the level of gross negligence and would be barred under RCW 71.05.120).  At most, Plaintiffs allege conduct on the part of Medical Center

---

[5] At most, Plaintiffs allege that Ms. Topping "failed to follow well established protocols for involuntary commitment procedures, and with deliberate indifference to the rights of others, let the mentally ill, violent and high [Mr.] Sauceda [sic] leave the hospital." (Compl. ¶ 7; *see also id.* ¶ 16 ("Defendants violated their own internal policies, practices, and mandates with regard to the creation of the dangers noted herein.").)  The court, however, need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Twombly*, 550 U.S. at 555 (stating that a plaintiff must provide "more than labels and conclusions").  Accordingly, the court declines to credit this allegation—particularly when it conflicts with specific facts Plaintiffs allege elsewhere in their complaint.  (*See, e.g.*, Compl. ¶ 13(b) (alleging that Mr. Sauceda "answered all of the standard questions regarding dare, time, current events, etc.").)

Defendants that is consistent with negligence.  Under RCW 71.05.120(1), Medical Center Defendants are immune from this claim, and accordingly, the court dismisses it.

**2. Duty**

Plaintiffs' negligence claim against Medical Center Defendants also fails because Medical Center Defendants owed no duty to Plaintiffs.  "In a negligence action, the threshold question is whether the defendant owes a duty of care to the plaintiff." *Zenina v. Sisters of Providence*, 922 P.2d 171, 173 (Wash. Ct. App. 1996).  "Under the common law, a person had no duty to prevent a third party from causing physical injury to another." *Peterson v. State*, 671 P.2d 230, 236 (Wash. 1983).  However, Washington courts have recognized an exception to this rule and "a duty to act for the potential victim of a psychiatric patient when 'a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct.'" *Volk v. DeMeerleer*, 386 P.3d 254, 260 n.2 (Wash. 2016) (quoting *Peterson*, 671 P.2d at 236 and Restatement (Second) of Torts § 315 (1965)).  "Stated another way, . . . once a special relation exists between the mental health professional and his [or her] patient, the mental health professional owes a duty of reasonable care to any foreseeable victim of the patient. *Id.*  However, such "a duty to a particular person will be imposed only upon a showing of a definite, established and continuing relationship between the defendant and the third party." *Honcoop v. State*, 759 P.2d 1188, 1195 (Wash. 1988); *Volk*, 386 P.3d at 263; *Hertog, ex rel. S.A.H. v. City of Seattle*, 979 P.2d 400, 407 (Wash. 1999) ("A duty will be imposed under Section 315 only where there is a 'definite, established and

continuing relationship between the defendant and the third party.'") (quoting *Taggart v. State*, 822 P.2d 243, 255 (Wash. 1992)).

In *Peterson*, a former Western State Hospital psychiatric patient was driving a vehicle under the influence of drugs when he was involved in an automobile accident with the plaintiff. 671 P.2d at 234. Five days before the accident, a doctor at Western State Hospital had released the patient. *Id.* Prior to the accident, the patient had been involuntarily admitted to Western State Hospital for 72 hours pursuant to RCW 71.05.180. *Peterson*, 671 P.2d at 234. A doctor at Western State Hospital later filed a petition to extend the patient's detention for an additional 14 days, which the court granted. *Id.* at 235. Ultimately, the patient received psychiatric care at the facility for more than two weeks. *Id.* at 234-35. While the patient was at Western State Hospital, a psychiatrist diagnosed him "as having a 'schizophrenic reaction, paranoid type with depressive features.'" *Id.* at 235. The psychiatrist opined that the patient's "schizophrenic symptomology was due primarily to the use of angel dust," and the psychiatrist prescribed antipsychotic medication. *Id.* The patient was ultimately discharged, and five days later was involved in the accident which formed the basis of the lawsuit. *Id.* Under these factual circumstances, the *Peterson* court held that the psychiatrist "incurred a duty to take reasonable precautions to protect anyone who might foreseeably be endangered by [the patient's] drug-related mental problems."[6] *Id.* at 237.

//

---

[6] The court described the reasonable precautions that the psychiatrist could take to include petitioning the court for a 90-day commitment under RCW 71.05.280. *Peterson*, 671 P.2d at 237.

1    The facts Plaintiffs allege here are markedly different than those that lead the
2  Washington Supreme Court to find a duty in *Peterson*.  Plaintiffs here do not allege any
3  definite, established, or continuing relationship between Medical Center Defendants and
4  Mr. Sauceda.  Instead, they alleged that police officers delivered Mr. Sauceda to Swedish
5  and that one of the officers filled out an involuntary commitment form, but did not list
6  Mr. Sauceda "as posing 'threats to others.'"  (*Id.* ¶¶ 13(a), 13(b).)  Plaintiffs allege that
7  Mr. Sauceda told Ms. Topping that he had feigned mental health symptoms, lied to police
8  because he wanted to go to jail, "answered all of the standard questions regarding date,
9  time, current events, etc.," and stated that he had no desire to harm himself or others.
10 (*Id.*)  Plaintiffs further allege that Ms. Topping concluded that Mr. Sauceda appeared to
11 be lucid and did not meet the criteria for an involuntary hold for a mental health
12 evaluation and treatment.  (*Id.*)  Notably, Plaintiffs do not allege that Ms. Topping formed
13 an opinion that Mr. Sauceda suffered from a mental illness or was potentially dangerous,
14 or that she had any reason to form such an opinion based solely on her interview with Mr.
15 Sauceda.  (*See generally id.*)  Finally, unlike the circumstances in *Peterson*, Plaintiffs do
16 not allege that Ms. Topping or Swedish provided any mental health treatment to Mr.
17 Sauceda or formed a therapist-patient relationship with him.  (*See generally* Compl.); *cf.*
18 *Peterson*, 671 P.2d at 237.  The single contact that Plaintiffs allege between Ms. Topping
19 and Mr. Sauceda is insufficient to create any duty running from Ms. Topping or Swedish
20 to Plaintiffs.
21    Indeed, this case is more like *Estate of Davis v. State of Washington, Department*
22 *of Corrections*, 113 P.3d 487, 490 (Wash. Ct. App. 2005), in which the court concluded

that no duty ran between a mental health counselor and a crime victim, who was murdered by someone the mental health counselor had previously assessed for mental health issues. In *Estate of Davis*, a licensed mental health counselor did an initial assessment on an individual under a community supervision sentence to determine if the individual "could benefit from further counseling." *Id.* at 490. Although the mental health counselor was initially concerned that the individual might be a danger to himself, the individual denied such thoughts, being violent, or having any intention to harm anyone. *Id.* The mental health counselor determined that the individual should be referred to a clinical program for individual therapy. *Id.* A few days after the initial assessment, the individual participated in a murder. *Id.* The estate of the murder victim sued the mental health counselor, among others, for negligence. *Id.* at 491. The Washington Court of Appeals, however, declined to hold that the mental health counselor had a duty to the murder victim. *Id.* at 492. In so holding, the Court of Appeals stated:

> [The mental health counselor] saw [the individual] only one time. He performed an initial assessment to determine if [the individual] would benefit from further counseling. This sole contact is not a definite, established, and continuing relationship that would trigger a legal duty.

*Id.*

The relevant facts underpinning the ruling in *Estate of Davis* are indistinguishable from those Plaintiffs allege here. Ms. Topping saw Mr. Sauceda only one time—when she performed an initial assessment under Washington's Involuntary Treatment Act. (*See* Compl. ¶ 13(b).) The allegations in the complaint do not support an inference of a definite, established, and continuing relationship between Medical Center Defendants and

1 | Mr. Sauceda. Based on the foregoing case authority, the court concludes that Medical
2 | Center Defendants did not owe any legal duty to Plaintiffs with respect to Mr. Sauceda's
3 | actions after Ms. Topping's assessment. Accordingly, the court dismisses Plaintiffs'
4 | claim for negligence against Medical Center Defendants.

5 | **D. Leave to Amend**

6 | "If a complaint is dismissed for failure to state a claim, leave to amend should be
7 | granted unless the court determines that the allegation of other facts consistent with the
8 | challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v.*
9 | *Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). However, "[a] district
10 | court does not err in denying leave to amend where the amendment would be futile."
11 | *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). The court has
12 | determined as a matter of law that Medical Center Defendants are not state actors subject
13 | to suit under 42 U.S.C. § 1983. *See supra* § III.B. The court has also determined that
14 | Medical Center Defendants are immune from Plaintiffs' negligence claim under RCW
15 | 71.05.120(1) and owed no duty to Plaintiffs as a matter of law. *See supra* § III.C. It
16 | would not be possible to Plaintiffs to cure these deficiencies "without contradicting . . .
17 | the allegations of [their] original complaint." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291,
18 | 296 (9th Cir. 1990). Because Plaintiffs cannot cure the deficiencies in their claims
19 | against Medical Center Defendants without contradicting allegations in their original
20 | complaint, the court declines to grant leave to amend.
21 | //
22 | //

## IV. CONCLUSION

Based on the foregoing analysis, the court GRANTS Medical Center Defendants' motion to dismiss (Dkt. # 9) and DISMISSES Plaintiffs' claims against Medical Center Defendants with prejudice and without leave to amend.

Dated this 3rd day of March, 2017.

*[signature]*

JAMES L. ROBART
United States District Judge